# CHARLESTON.

D. M. CUMMINS, ADMRX., v. THE VIRGINIAN RAILWAY CO.

(No. 5307)

Submitted April 29, 1925. Decided May 12, 1925.

EVIDENCE—*Opinion Evidence Held Insufficient to Support Verdict for Injuring From Defect in Locomotive.*

> In an action under the federal safety appliance acts of Congress, for personal injuries due to alleged defects in a locomotive engine, the testimony of locomotive engineers relied on by plaintiff, who have operated the locomotive alleged to be defective, or other locomotives of the same type, but who are not shown to have any knowledge of the particular parts of the engine which are alleged to be defective, but simply give their opinion that certain parts are defective because steam passes from one part of the engine to another and escapes through a certain valve, will be overthrown by the testimony of others, shown to have actual knowledge of the machinery in question and who describe its operation clearly, from which it appears that the plaintiff's witnesses were mistaken in their conclusions, and where the facts testified to by defendant's witnesses are corroborated by the manual or instruction book published by the manufacturer of the locomotive, introduced in evidence, explaining the operation of the parts alleged to be defective; and a verdict in favor of plaintiff based on such evidence should be set aside.

Appeal from Circuit Court, Wyoming County.

Action by D. M. Cummins, administratrix, against the Virginian Railway Company. From a judgment for plaintiff, defendant appeals.

*Judgment reversed; verdict set aside; case remanded.*

*Brown, Jackson & Knight, Williams, Loyall & Tunstall, Martin & Wingfield* and *M. P. Howard,* for plaintiff in error.

*A. A. Lilly,* for defendant in error.

MILLER, JUDGE:

This action was brought under the Federal Employers' Liability Act of Congress. The jury returned a verdict in

favor of plaintiff for $30,000.00, which the court reduced to $22,500.00; and judgment was entered for that amount. The defendant has appealed.

The act or acts of negligence relied on are that the defendant "negligently, illegally, and unlawfully permitted and suffered one of said pusher engines, designated as No. 802, attached to the rear end of said train of freight cars, to be and remain weak, unsafe and insufficient, and to have on it a certain attachment and appliance known as a safety and relief valve of the low pressure cylinder, which was unsafe, weak and insufficient, and to have also the piston packings, cylinder cocks, pipes, valves and appliances unsafe, weak and insufficient," by reason of which "great, unusual and unnecessary amounts of steam were then and there escaping from said pusher engine, and from said valves and appliances in such a way and to such an extent, that the said Burns was unable to see or hear or know that two light engines of the said defendant company were drifting back and running light on the west bound track," as a result of which he was struck and killed by the said west bound engines.

From the allegations of the declaration, the evidence adduced on the trial, and the instructions given to the jury, it appears that the plaintiff relied wholly on the several Safety Appliance Acts of Congress, as amended by the Act of March 4, 1915, chapter 169, 38 Stat. L. 1192. The only questions presented to the jury were, whether engine number 802 was defective, and if so, whether such defective condition was the proximate cause of the accident causing the death of plaintiff's intestate.

At the time of the accident complained of plaintiff's intestate, J. J. Burns, was employed as a brakeman on defendant's freight train, consisting of about fifty cars loaded with coal, two engines and a caboose. The train was headed eastward and had stopped to allow the engine at the front of the train to take water; and Burns, who was riding in the caboose, had been instructed by the conductor to inquire of the engineer on the pusher engine, No. 802, attached to the rear of the train immediately in front of the caboose,

if he wished to stop at the water tank for water. Burns walked forward along the left side of the tender, between the east and west bound tracks, to the engine cab, where he was informed by the engineer that the latter would take water at the tank where the front engine was then standing. From the time he was seen standing by the side of the engine, by the engineer and fireman, no one saw Burns until some time later when his mangled body was found on the west bound track.

It appears that when the pusher engine was to take water, it was the duty of a brakeman to uncouple the engine from the train and spot it at the water tank. Whether or not Burns at the time started forward to the front of the engine is not known. The pusher engines returning on the west bound track, which are supposed to have struck and killed him, passed just after the engineer told him he would stop at the tank for water.

Engine number 802 is of the Mallet articulated compound type, manufactured by the American Locomotive Company. The relief valve alleged to have been defective, and from which the steam obscuring Burns' vision of the approaching engines was escaping, was located on the left steam chest of the low pressure engine, at the extreme front of the locomotive. There is a similar valve on the right steam chest. The purpose of these valves is to allow the steam to escape from the low pressure engine when the steam pressure rises to a certain point, determined by the particular adjustment of the valves, in order that the pressure may not become so high as to burst the low pressure cylinders. When the locomotive is running compound, the low pressure engine is operated by the exhaust steam from the high pressure engine located under the boiler about the middle of the locomotive. After leaving the high pressure cylinders the steam passes through the intercepting valve into the receiver, and thence to the low pressure steam chests.

The theory of the plaintiff is that if the packing, cylinder rings and valve rings of the high pressure engine, and the intercepting valve controlling the passage of steam between

the two engines, were in proper condition and repair, no steam could enter the low pressure engine when the locomotive was standing still, although the throttle was open, admitting steam to the high pressure engine. It appears that when the train stopped, the engineer on engine number 802 left the throttle open in order to hold the train on the steep grade and to prevent it from breaking in two when the front engine started.

Plaintiff introduced the evidence of five engineers, who were or had been in the service of the defendant, three of them being on a strike at the time of the trial. Martin, engineer on engine number 802 at the time of the accident, testified that when the engine was standing still with the throttle open, no steam could have passed to the low pressure engine unless the valve rings or cylinder rings or the intercepting valve was leaking, and that the escaping of steam from the relief valve on the left low pressure engine steam chest was to be accounted for by, "unequal adjustment of the valves, the weakest part," and indicated "a badly worn part or unequal adjustment." The witness Chambers, state factory inspector for the state of Virginia, and who was employed by the defendant company from 1909 to 1922, in the capacity of fireman, engineer, road foreman of engines and round house foreman, testified that unless there was a defect as just described,—defect in the valve packing, the cylinder packing, leaking in the high pressure engine or a leaking intercepting valve,—with the engine standing, there would be no way for the steam to get into the low pressure engine. Engineer Thomas, when asked if there would have been any steam leak, if the engine had been in proper condition, with the throttle opened, answered: "No sir, I don't think so." To a similar question, engineer Rolles, who also regularly drove engine number 802, answered: "I don't think so." And the witness Stover, who had also operated the same engine, testified: "I don't see how it (the steam) could get out any way only through a leaking intercepting valve or broken or worn piston rings or valve rings;" and when asked if steam could have escaped to the low pressure engine if

those parts were working right, the witness answered: ''No, it couldn't get out, if they were, that I know of.''

Defendant's witnesses, Godby, road foreman of engines, Akers, road foreman of engines, and Perkins, assistant road foreman of engines, all testified that in the American Locomotive Company's type of compound Mallet locomotive, the intercepting valve is automatic in its action; that when the locomotive is standing the valve automatically cuts off the exhaust steam and at the same time allows live steam from the boiler to enter the low pressure engine, and that this valve remains in that position until the exhaust pressure from the high pressure engine has built up sufficiently to operate the low pressure engine, when it automatically opens the passage from the high pressure cylinders to the receiver and cuts off the supply of live steam from the boiler direct. They explained that in starting the locomotive, there being no exhaust steam in the receiver to drive the low pressure engine, it is necessary that steam from the boiler direct be introduced into the low pressure engine to supply it with motive power; otherwise only the drive wheels operated by the high pressure engine would exert any power on the rails, and that would not give sufficient traction to move a heavy train, and the wheels would be likely to slip. They also say that when the locomotive is running, the intercepting valve opens and closes automatically, in order to keep the steam pressure equalized in the proper proportion between the two engines, and that if either engine is oversupplied with steam, the drive wheels operated by that engine will slip on the rails; and if the low pressure engine becomes oversupplied, the relief valves on the steam chests, mentioned above, are forced open, allowing the excess of steam to escape into the atmosphere. These witnesses are corroborated by James G. Brown, road foreman of engines and assistant train master for the Chesapeake & Ohio Railway Company. There was also read into the evidence, by the witness Perkins, the following from the Manual of the American Articulated Compound Engine, published and distributed by the American Locomotive Company, the company who built the engine in

question here: "In every compound locomotive steam must be admitted direct from the boiler to the low pressure cylinders in starting and until they are supplied with steam by the exhaust from the high pressure cylinders. Provision is usually made by which in cases of emergency, when additional hauling capacity is required, the locomotive may be changed from working compound into simple with an increase of power. In the American articulated compound locomotive, a special mechanism called the intercepting valve performs these two duties. This valve is located between the receiver and the exhaust passages from the high pressure cylinders. It is practically automatic in its operation."

In connection with the evidence above detailed, we have examined a number of works and articles on the operation of compound locomotive engines, and find without exception, that where the intercepting valve used by the American Locomotive Company is described, it is said to operate automatically, as detailed by defendant's witnesses on the trial. See Locomotive Dictionary and Encyclopedia, published by Simmons-Boardman Publishing Company, (5th ed. 1919), pp. 1023-1025; Locomotive Engine Running and Management, by Angus Sinclair, (23d. ed.) pp. 391-423; Webster's International Dictionary, subject "intercepting valve;" and articles in the Britannica, Americana, and International encyclopedias, titles "Railways," "Locomotive," and "Steam Engines."

None of plaintiff's witnesses qualified as experts to testify as to the operation of the valves alleged to be defective, nor is it shown that any of them had ever seen or inspected, or received any instruction about, an intercepting valve. They simply gave their opinion as to whether or not steam would pass to the low pressure engine under the conditions stated in evidence, if the parts were all in proper condition and repair, and three of them answered in substance: "I don't think so." On the other hand two, at least, of defendant's witnesses testified that they were familiar with the various parts of locomotive engines of the type of number 802, and all gave very lucid and clear explanations of the operation of

the intercepting valve, and the effect that the open throttle would have when the locomotive was standing on a steep grade, holding the heavy train. Indeed, it appears to us that the presence of steam in the low pressure engine, considering all the evidence exhibited by the record, indicates that this valve was properly performing the office for which it was installed. The explanation given by defendant's witnesses seems so plausible, that it would be difficult to believe they were mistaken in their conclusions, and that the engineers were correct.

While there was no objection on the trial to the testimony of the engineers, on the ground that they were not qualified to give their opinions as to whether or not there should have been steam in the low pressure engine, the fact of their knowledge or lack of knowledge of the operation of the mechanism of the engine, does affect the weight of their testimony. And in *McKelvey* v. *C. & O. Ry. Co.*, 35 W. Va. 500, it was held: "A locomotive engineer, without any experience or skill in the construction or repair of boilers, is not an expert as to the effect of broken stay bolts in the boiler or of mud packing therein. His opinion is not admissible." And in the opinion in that case, it is said: "The locomotive, that wonder of our days, is the embodiment of great mechanical genius, study, science, skill and experience. It daily stands before us who have no learning and skill in that department of human knowledge as an insoluble enigma. None but those whose eyes and brains are trained in its principles and construction can pierce its secrets and as experts adequately or reliably tell of its elements and their office. * * * This witness had simply used engines as an engineer, and had perhaps become acquainted with the practical working of some of their parts, but that is all."

From the evidence in the record, we think plaintiff has failed to establish proof of any defect in the locomotive between the high and low pressure engines, as alleged in the declaration. Was there a defect in the relief valve on the steam chest, where the steam was escaping into the atmosphere?

As indicated above, the office of this valve was to permit the steam to escape when the pressure became excessively high, in order to prevent bursting of the cylinders. The normal pressure required by the low pressure engine is about 45 per cent. of the boiler pressure, or about 90 pounds per square inch. It appears that the boiler pressure is 200 to 220 pounds. The evidence tends to show that a great volume of steam was escaping, with a loud noise. Would not this indicate that the valve had been forced open by the pressure of the steam, and that it was not leaking due to a defect in itself, or from steam leaking through some other part of the engine, into the receiver? There is no direct evidence of a defect in this valve, at the time of the accident. Martin testified that some time before, when he did not remember, "probably been several months," he had reported that steam was escaping from the left relief valve. But in his report, after returning from the run on which the accident occurred, he did not report any defect in this valve, although his report contained five different items of parts needing attention, none of which, however, as he testified, had anything to do with the leaking of steam from the relief valve. Defendant's machinist Tower testified that he had inspected engine number 802 on the day of the accident, and found it in "normal condition."

From the evidence adduced on the trial, we are of opinion that plaintiff has failed to sustain the allegations in her declaration, charging defendant with maintaining and operating a defective locomotive; and that the trial court should have given to the jury defendant's instruction number five, to find for defendant, because the evidence was not sufficient to sustain a verdict for the plaintiff.

The judgment will be reversed, the verdict set aside, and the case remanded for a new trial.

*Judgment reversed; verdict set aside; case remanded.*